UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                   :

UNITED STATES OF AMERICA,            :

                                                  :                         98 Cr. 185 (JPC)
                    -v-                                     :

                                                  :                     <u>OPINION AND ORDER</u>

ALBERTO RAPOSO,                        :

                                                  :

                         Defendant.          :

                                                  :
-------------------------------------------------------- X

JOHN P. CRONAN, United States District Judge:

        Defendant Alberto Raposo, a federal inmate serving a forty-three-year sentence for committing an arson that took the life of a New York City firefighter, moves for compassionate release from prison under 18 U.S.C. § 3582(c)(1)(A)(i). Dkt. 86 ("Motion"). The Government opposes the Motion on the grounds that Raposo has failed to show "extraordinary and compelling reasons" to warrant early release and alternatively that several factors under 18 U.S.C. § 3553(a) independently counsel against a sentence reduction. Dkt. 91 ("Opposition"). For the reasons that follow, Raposo's Motion is denied.

## I. Background

**A.     Offense Conduct**[1]

        In June 1994, Raposo was living with two men, Hector Ruiz and Abraham Delvalle, in a building at 79-81 Worth Street in Manhattan. Dkt. 86-5 ("PSR") ¶¶ 6. On the evening of June 5, after a dispute with Ruiz, Raposo set eight fires throughout various floors and the subcellar of 79-81 Worth Street. *Id.* ¶¶ 9, 12. Raposo waited until Ruiz and Delvalle were inside the building

---

[1] The following description of Raposo's offense conduct is based on the evidence presented at his trial before the Honorable Deborah A. Batts, which culminated with a guilty verdict on February 9, 1999.

on the fifth floor before setting the fires. *Id.* ¶ 12. Raposo set the first fire in the subcellar, proceeded to the fourth floor where he gathered his belongings and set more fires, and then set additional fires on the second floor, in the lobby, and outside the building. *Id.* ¶¶ 12-13. Raposo also strategically poured oil on egresses including a stairwell leading to a fire escape and the fire escapes themselves, locked the doors with a mortise lock to which he held the only key, and removed wires to disable the building's fire alarm. *Id.* ¶¶ 11, 13.

Ladder Company #8 of the New York City Fire Department ("FDNY") was the first unit to respond to the fire. *Id.* ¶ 14. After forcing open the locked front door, firefighters encountered Ruiz and Delvalle, stumbling through smoke trying to find their way out of the building, and guided the two men to safety. *Id.* Moments later, firefighters with FDNY Ladder Company #6, led by Lieutenant George Lener, fought the blaze in the subcellar of the building, navigating their way through water that had accumulated from the sprinkler system. *Id.* Lieutenant Lener remained alone in the subcellar after the tanks of the firefighters under his command ran dry. *Id.* ¶ 15. Subsequently, other firefighters heard a distress call, and one eventually found Lieutenant Lener facedown and unconscious in a foot of water in the subcellar. *Id.* Lieutenant Lener was carried out by five firefighters and rushed to a hospital in an ambulance. *Id.* ¶ 16. Tragically, Lieutenant Lener never regained consciousness, and, approximately forty-five days later, died of carbon monoxide poisoning endured in the subcellar. *Id.*

About ten days after the fire, Raposo was found by fire marshals at his mother's house and agreed to come to their office for questioning. *Id.* ¶ 17. After being advised of and waiving his constitutional rights, Raposo admitted to setting fires throughout 79-81 Worth Street and signed a confession. *Id.* The following day, Raposo gave a video-taped confession before an assistant district attorney. *Id.* In addition, recovered from Raposo's mother's house were the only key to

the mortise lock and a purple cigarette lighter, which Raposo admitted to using to start the fire. *Id.* ¶ 13.

### B. Procedural History

Raposo originally was charged in New York Supreme Court, New York County, with arson in the first degree, arson in the third degree, and murder in the second degree. *Id.* ¶¶ 3, 43. On July 1, 1996, a jury found Raposo not guilty of those state charges. *Id.* ¶ 43.

A federal investigation followed Raposo's state court acquittal, leading to his arrest on federal arson charges on March 5, 1998. *Id.* ¶ 4. The Indictment, which was filed on March 4, 1998, charged Raposo with one count of committing arson of property used in interstate commerce, with death resulting, in violation of 18 U.S.C. § 844(i). *Id.* ¶ 1.[2] On February 9, 1999, Raposo was found guilty of that count by a jury. *Id.* ¶¶ 2, 18. The conviction carried a maximum term of imprisonment of life. *Id.* ¶ 69; *see* 18 U.S.C. § 844(i) (1994).

At sentencing on June 8, 1999, Judge Batts arrived at an offense level of 42. Dkt. 91-1 ("Sentencing Tr.") at 9:8. Judge Batts declined to impose an obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1, finding no clear or convincing evidence that Raposo committed perjury. *Id.* at 7:23-25. Judge Batts also declined to depart downwardly based on the size of the fires, based on the successive prosecution, or based on Raposo's rehabilitation. *Id.* at 8:8-12. Judge Batts additionally noted that, while she did not view the evidence as conclusively establishing that Raposo's motive in setting the fires was to kill Ruiz and Delvalle, a downward departure on that basis was not warranted in light of "the degree of risk inherent in the conduct and the nature of the underlying offense conduct." *Id* at 8:24-25. As Judge Batts explained:

---

[2] 79-81 Worth Street was a commercial building, with one occupant, Bargain City, that had some of its merchandise shipped from out of state, and with its ground floor and basement leased to another company, The Road Show, that regularly imported clothing from out of state. PSR ¶ 5.

3

> Arson always includes the inherent risk that life will be lost. When the life lost is that of a firefighter in the line of duty -- and several fires were set, including near the obvious way of egress from the burning building -- the Court declines to exercise that discretion to depart downwardly for that reason.

*Id.* at 9:1-6. Judge Batts did, however, downwardly depart to offense level 42 because the Government did not seek a recommendation of life imprisonment from the jury. *Id* at 9:7-14 (citing *United States v. Tocco*, 135 F.3d 116, 132 (2d Cir. 1998)).[3] Offense level 42 resulted in a Guidelines range of 360 months to life imprisonment. *Id*. at 9:15-17.

Prior to imposing sentencing, Lieutenant Lener's wife addressed the Court. *Id.* at 10:22-17:6. She spoke powerfully about the devastating impact of her husband's death on their family and friends, the rough childhood he overcame, his generosity, his love of his job as a firefighter, and their future retirement plans. *Id.* at 11:8-13:16, 15:2-17:6. She also recounted the horrible forty-five days her husband spent in the hospital, with "machines and tubes hooked to every part of his body," never to regain consciousness. *Id.* at 13:17-15:1.

In imposing sentence, Judge Batts emphasized the "extremely serious and dangerous" nature of arson, and why arsonists must be held responsible for the consequences of fires they ignite:

> Once a fire is started and the forces of nature are invoked, no person can know what the final toll of destruction or death will be. The point at which individuals can control fire is in deciding not to set them. Once they set a fire, they must be held responsible for all the consequences of their actions.

---

[3] Without this downward departure, the offense level would have been 43. Pursuant to section 2K1.4(c)(1), "[i]f death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above." U.S. Sent'g Guidelines Manual § 2K1.4(c)(1) (U.S. Sent'g Comm'n 1998). Given Raposo's conduct and the resulting death of Lieutenant Lener, the most applicable Guideline was section 2A1.1 (First Degree Murder) with a base offense level of 43. *Id.* § 2A1.1; *see* PSR ¶ 27.

*Id.* at 18:7-13.  It is for that reason, Judge Batts explained, that Raposo must "be held accountable for the loss of the life of Lieutenant Lener."  *Id*. at 18:16-17.  At the same time, Judge Batts acknowledged that Raposo was "a troubled individual who ha[d] not learned socially acceptable means of coping with stresses, failure, and difficulties in life," and that "[h]is mental capacity and emotional development may [have] contribute[d] to that maladjustment."  *Id.* at 18:18-22.

In arriving at the sentence, Judge Batts determined that it was not "necessary or appropriate to deprive [Raposo] of all benefit he may earn from proper social adjustment to his life in prison," and therefore declined to impose a sentence that would "negate[] any good time he may be able to earn and be credited with while serving his sentence."  *Id.* at 19:1-6.  Judge Batts therefore consulted the National Vital Statistics Report to determine Raposo's projected life expectancy, *id.* at 19:7-12, and imposed a sentence of 524 months in prison to be followed by five years of supervised release, *id.* at 19:20-25.[4]

---

[4] Raposo's conviction has been repeatedly affirmed on appeal and collateral review.  The Second Circuit affirmed Raposo's conviction on February 17, 2000, *United States v. Raposo*, 205 F.3d 1326 (2d Cir. 2000), and the Supreme Court denied his petition for a writ of *certiorari* on May 30, 2000, *Raposo v. United States*, 530 U.S. 1210 (2000).  Judge Batts denied Raposo's motion to vacate his sentence pursuant to 28 U.S.C. § 2255 on May 7, 2004, *Raposo v. United States*, Nos. 01 Civ. 5870 (DAB), 98 Cr. 185 (DAB), 2004 WL 1043075 (S.D.N.Y. May 7, 2004), and denied reconsideration of that denial on February 8, 2005, *Raposo v. United States*, Nos. 01 Civ. 5870 (DAB), 98 Cr. 185 (DAB), 2005 WL 292750 (S.D.N.Y. Feb. 8, 2005).  The Second Circuit then denied a certificate of appealability.  *Raposo v. United States*, No. 05-1362 (2d Cir. Aug. 5, 2005); *see also* Dkt. 67 (Second Circuit mandate).  On September 19, 2016, the Second Circuit denied Raposo's motion for leave to file a successive section 2255 petition based on *United States v. Johnson*, 576 U.S. 591 (2015).  *Raposo v. United States*, No. 16-1426, Dkt. 38 (2d Cir. Sept. 19, 2016); *see also* Dkt. 69 (Second Circuit mandate).  Then, on March 1, 2017 and April 5, 2017, respectively, Judge Batts denied two motions in which Raposo sought a sentence reduction or a resentencing to time served.  Dkts. 71, 73.  On July 30, 2019, Judge Batts denied Raposo's request for appointment of counsel to appeal his conviction and sentence.  Dkt. 78.  And most recently, on August 28, 2019, the Second Circuit denied Raposo's request for leave to file a successive section 2255 petition based on *United States v. Davis*, 139 S. Ct. 2319 (2019).  *Raposo v. United States*, No. 19-2328, Dkt. 23 at 2 (2d Cir. Aug. 28, 2019).  The case was reassigned to the undersigned on June 28, 2021, following Judge Batts's death.  Dkt. 81.

### C. Raposo's Incarceration and Request for Administrative Remedy

Raposo is currently incarcerated at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury") and has served approximately twenty-four years of his sentence. Dkt. 91 ("Opposition") at 2-3. According to the Bureau of Prisons ("BOP") website, and assuming Raposo receives credit for good conduct time, his projected release date is June 13, 2033. *See* Find an Inmate, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Jan. 4, 2023); *see also* Opposition at 3.

By all accounts, Raposo's behavior in prison has been commendable. He has completed thousands of hours of educational courses, has developed a specialization in horticulture and landscaping, and has put that training to good use such as by installing a new irrigation system in the prison greenhouse. Motion at 10-11; *see also* Dkt. 101 ("Oral Arg. Tr.") at 3:25-5:7. This has led to Raposo receiving numerous recognitions for his contributions in prison. Motion at 11-12. Raposo also has maintained a nearly spotless disciplinary record while incarcerated. *Id.* at 12.

On April 30, 2020, Raposo filed a Request for Administrative Remedy with FCI Danbury seeking compassionate release. Opposition, Exh. 4 at 3. On May 11, 2020, the Warden denied that request. Opposition, Exh. 5 at 2. Raposo subsequently moved for compassionate release before this Court on August 11, 2022. *See* Motion. The Government opposed the Motion in part on administrative exhaustion grounds, arguing that Raposo's administrative "request did not contain any of the arguments that he makes in the present motion before the Court," thus depriving the BOP of the opportunity "to weigh in on those arguments." Opposition at 5. In response, on or about October 17, 2022, Raposo submitted a supplemental request to the Warden at FCI Danbury, specifically raising the grounds argued in his Motion. *See* Dkt. 94 at 1. That supplemental request was denied by the Warden on November 16, 2022. Dkt. 98-1.

## II. Legal Standard

A defendant may seek compassionate release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A). *See also United States v. Newton*, No. 18 Cr. 373 (RJS), 2021 WL 321847, at *2 (S.D.N.Y. Feb. 1, 2021) ("The Court may not modify a term of imprisonment once it has been imposed except pursuant to statute." (internal quotation marks omitted)). The statute provides, in relevant part, that upon motion of a defendant, the court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).[5] Thus, district courts face two questions in addressing the merits of such compassionate release motions: (1) whether extraordinary and compelling reasons merit reducing the sentence and (2) how the section 3553(a) factors weigh. *United States v. Bennett*, No. 15 Cr. 95 (JPC), 2022 WL 3445349, at *2 (S.D.N.Y. Aug. 17, 2022). In doing so, the Sentencing Commission's policy statement at section 1B1.13 of the Guidelines Manual no longer limits district courts. *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). Instead, courts may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Id.* As the moving party, Raposo bears the burden of establishing his entitlement to early release. *See, e.g.*, *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has

---

[5] Section 3581(c)(1)(A) also provides that a motion for compassionate release cannot be brought until after "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). As noted, the Government initially contended that Raposo failed to satisfy this administrative exhaustion requirement. Opposition at 5. The Government no longer is pressing an exhaustion argument on account of Raposo's filing of a supplemental administrative request with the BOP and FCI Danbury's denial of that request. *See* Oral Arg. Tr. at 2:16-20.

7

the burden of showing that the circumstances warrant that decrease."); *United States v. Phillibert*, 557 F. Supp. 3d 456, 459 (Aug. 27, 2021).

### III.  Discussion

**A.  Extraordinary and Compelling Reasons**

Raposo's Motion argues three grounds for his early release: (1) various effects of the COVID-19 pandemic, Motion at 19-21; (2) the BOP's failure to properly treat his acute appendicitis, *id.* at 21; and (3) evidence of his rehabilitation, *id.* at 21-23.[6] These grounds, addressed in turn below, fail to constitute "extraordinary and compelling reasons" that warrant a sentence reduction.

**1.  COVID-19 Pandemic**

Raposo's arguments pertaining to the COVID-19 pandemic concern both the ongoing risk posed to his health, as well as the harsher conditions of incarceration caused by the pandemic. Motion at 19-21. Raposo, a 51-year-old man who is vaccinated and boosted, contends that "[w]hile the world seems to have moved on from COVID-19, for better or worse, prisoners are still at a heightened risk of infection and even death from COVID-19." *Id.* at 20. These pandemic-related

---

[6] To the extent that Raposo's Motion could be read as also raising actual innocence as a basis for relief, Motion at 8, "[f]acts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to" a habeas petition, *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022). "Permitting [the defendant] to make actual innocence arguments in this manner would enable him to pursue habeas relief through a compassionate release motion and thereby evade the procedural limitations on bringing habeas claims." *United States v. Jacques*, Nos. 20-3276, 21-1277, 2022 WL 894695, at *2 (2d Cir. Mar. 28, 2022). The Court notes, however, that in denying Raposo's most recent request for leave to file a successive section 2255 petition, the Second Circuit commented that "[t]o the extent [Raposo] raises an actual innocence claim, he has not made a showing 'that, in light of new evidence, "it is more likely than not that no reasonable juror would have found [Raposo] guilty beyond a reasonable doubt."'" *Raposo*, No. 19-2328, Dkt. 23 at 2 (quoting *House v. Bell*, 547 U.S. 518, 536-37 (2006)).

8

arguments, as they relate to Raposo, are not persuasive and do not counsel in favor of his early release.

Starting with the health risks associated with COVID-19, multiple courts have concluded that "the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *United States v. Serrano,* No. 15 Cr. 608, 20 Civ. 9887 (KPF), 2022 WL 1443688, at *14 (S.D.N.Y. May 6, 2022) (quoting *United States v. Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1 (S.D.N.Y. May 14, 2020)); *United States v. Thomas*, No. 15 Cr. 667 (KPF), 2020 WL 6364677, at *4 (S.D.N.Y. Oct. 29, 2020). Raposo has failed to persuasively identify additional factors warranting compassionate release.

Raposo cites high rates of infection and isolation at FCI Danbury in January 2022, the height of the Omicron variant. Motion at 20. But more recent COVID rates at the prison show a dramatic decrease from that peak. For instance, at the time of the Government's August 26, 2022 submission, only 0.01% of the inmate population at FCI Danbury had COVID-19. Opposition at 6. Raposo in fact stands at an even lower risk of contracting COVID-19 or suffering serious complications from the virus, given that (1) he is double-vaccinated and boosted, Opposition, Exh. B at 41; Exh. C at 39; *see COVID-19 Treatments and Medications*, Centers for Disease Control and Prevention (Dec. 5, 2022), https://www.cdc.gov/coronavirus/2019-ncov/your-health/treatments-for-severe-illness.html ("Being vaccinated makes you much less likely to get very sick."; "COVID-19 vaccines available in the United States effectively protect people from getting seriously ill, being hospitalized, and even dying—especially people who are boosted."); *see also United States v. Sosa*, No. 14 Cr. 468 (AT), 2022 WL 1690833, at *3 (S.D.N.Y. May 26, 2022)

(collecting cases discussing that booster shots reduce risk); *United States v. Jaber*, No. 13 Cr. 485 (CM), 2022 WL 35434, at *2-3 (S.D.N.Y. Jan. 4, 2022) (collecting cases discussing that vaccinations reduce risk), and (2) he already was infected with and recovered from COVID-19, *see United States v. Hardy*, No. 11 Cr. 629 (CS), 2020 WL 7711676, at *2 (S.D.N.Y. Dec. 29, 2020) ("This Court and others have declined to find 'extraordinary and compelling circumstances' in cases where a defendant has a prior COVID-19 diagnosis." (internal quotation marks omitted)).

Nor does Raposo claim to suffer from any "underlying medical conditions" listed by the Centers for Disease Control and Prevention ("CDC").[7] *See Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals*, Centers for Disease Control and Prevention (Dec. 5, 2022), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. While the CDC recognizes that the "[r]isk of severe outcomes is increased . . . in people who are 50 years and older," it explains that "risk increas[es] substantially at ages >65 years," *id.*, with "[p]eople 85 and older . . . the most likely to get very sick," *COVID-19 Risks and Vaccine Information for Older Adults*, Centers for Disease Control and Prevention (Aug. 4, 2021), https://www.cdc.gov/aging/covid19/covid19-older-adults.html. *See United States v. Mason*, No. 96 Cr. 126 (JFK), 2021 WL 37576, at *3 (S.D.N.Y. Jan. 5, 2021) (recognizing that the CDC has warned that COVID-19 is especially risky for individuals age 65 and older); *see also United States v. Pabon*, No. 17 Cr. 312 (JPC), 2021 WL 603269, at *2 (S.D.N.Y. Feb. 16, 2021) ("But even crediting Pabon's medical claims, the Court is unpersuaded that they are 'extraordinary and compelling reasons' that justify release. Pabon is an otherwise healthy fifty-three-year-old male."). Thus, Raposo's age of 51, without more, does not

---

[7] As discussed at *infra* II.A.2., the Court is not persuaded that Raposo's acute appendicitis places him at an elevated risk of serious complications from COVID-19.

provide a justification for his early release. *See United States v. Haney*, 454 F. Supp. 3d 316, 323 (S.D.N.Y. 2020) ("[I]f [the defendant's] age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress.").

In addition to citing the medical risk posed by COVID-19, Raposo contends that that the pandemic has brought about burdensome conditions of incarceration, such as restrictions on visitation and prison programs. Motion at 20; Dkt. 92 ("Reply") at 3. In support, he cites *United States v. Lizardi*, No. 11 Cr. 1032 (PAE), 2020 U.S. Dist. LEXIS 188147, at *10-11 (S.D.N.Y. Oct 9, 2020), where the court expedited the defendant's release to a halfway house by five months after noting that, on account of the pandemic, the defendant's "term in custody has proven more arduous than the Court—or anyone—could ever have anticipated in 2014" when the defendant was sentenced, *id.* at *8. *See* Motion at 20. But *Lizardi* was decided in October 2020, well before COVID-19 vaccines were authorized by the U.S. Food and Drug Administration, let alone publicly available, and when far more stringent prison conditions were commonplace with the virus rapidly spreading.[8] Moreover, finding "extraordinary and compelling reasons" based on generally-shared and widespread burdens arising from the COVID-19 pandemic—burdens which since have been significantly relieved—would undermine the limited intended scope of compassionate release.

---

[8] The Honorable Paul A. Engelmayer also noted in *Lizardi* that the defendant there was "the rare violent-gang defendant as to whom the § 3553(a) factor requiring that a sentence 'protect the public from further crimes of the defendant' does not demonstrably require long incarceration." 2020 U.S. Dist. LEXIS 188147, at *7.

11

### 2. Acute Appendicitis

In July 2021, Raposo was diagnosed with acute appendicitis while incarcerated at FCI Danbury. Motion at 21; *id.*, Exh. 11 at 37. He alleges the facility mishandled the medical treatment of his condition, resulting in ongoing pain and discomfort, as well as a heightened risk of serious illness were he to contract COVID-19 again. Motion at 21; Reply at 2-3. The Government acknowledges "confusion" in the BOP's scheduling a colonoscopy for Raposo, but argues against his release on this basis, citing medical records that show BOP's efforts to treat Raposo's condition. Opposition at 7-8.

As an initial matter, the circumstances surrounding the BOP's treatment of Raposo's acute appendicitis do not support his early release. The record reflects that he had multiple doctor visits to determine whether an appendectomy was the appropriate course, that his condition was resolved with antibiotics, Motion, Exh. 11 at 2, and that he underwent a colonoscopy in October 2022, Dkt. 99.

Also unpersuasive is Raposo's argument that acute appendicitis presents a "compromising medical condition" that raises the risk of serious illness from COVID-19. Reply at 3. He cites no medical evidence in support of this argument. And more importantly, the CDC has not identified appendicitis among the conditions known to increase risk of severe COVID-19 symptoms. *E.g.*, *Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals*, Centers for Disease Control and Prevention; *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 6, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; *see United States v. Jones*, 852 F. App'x 60, 61 (3d Cir. 2021) (affirming the district court's decision to deny a motion for compassionate release based on appendicitis, among other chronic maladies); *United States v. Gomez*, No. 95 Cr. 750 (NGG), 2021 WL 1254549, at *3

(E.D.N.Y. Apr. 5, 2021) ("Although [the defendant] suffers from appendicitis . . . the CDC does not list [that condition] among the conditions that are known to increase the risk of severe illness should [the defendant] contract COVID-19 again.").

For these reasons, Raposo's claimed improper treatment of his appendicitis and any resulting complications do not weigh in favor of his early release.

### 3. Rehabilitation

Having found that neither the pandemic nor Raposo's acute appendicitis counsel in favor of compassionate release, the Court turns to his final argument: his lack of a prison disciplinary record and his rehabilitation efforts support a sentence reduction. Motion at 21-23. During his approximately twenty-seven years of state and federal incarceration, his disciplinary record has been nearly faultless. *Id.*, Exh. 10 at 2. It also appears that Raposo has engaged in substantial efforts at his rehabilitation while incarcerated, having spent significant time and energy bettering himself and the prison community and resulting in his receipt of an impressive number of academic and professional commendations. *See id.*, Exh. 8.

But, as Raposo acknowledges, Motion at 17, "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added). As discussed above, the Court does not find the COVID-19 pandemic or Raposo's appendicitis as providing any grounds to support his compassionate release. As such, his rehabilitation alone cannot constitute "extraordinary and compelling reasons."

The Honorable Richard J. Sullivan encountered similar facts in *United States v. Camisa*, No. 16 Cr. 522 (RJS), 2021 WL 517739 (S.D.N.Y. Feb. 10, 2021), where the defendant had a disciplinary record with a single infraction, received a GED while incarcerated, and cited COVID-19 risk without an underlying condition. Judge Sullivan determined that "the Court cannot conclude that every inmate with a generally favorable prison record automatically has an

'extraordinary' reason for early release when the BOP facility in which he resides experiences an uptick of COVID-19 cases." *Id.* at *2. The same analysis holds true here.

\* \* \*

Accordingly, Raposo has failed to establish "extraordinary and compelling reasons" to warrant his early release.

**B.     Section 3553(a) Sentencing Considerations**

Even had Raposo established "extraordinary and compelling reasons" that merit an early release, however, the analysis would not end there. The Court also would need to consider whether a sentence reduction is warranted "after considering the factors set forth in section 3553(a) to the extent they are applicable." 18 U.S.C. § 3582(c)(1)(A); *see also Bennett*, 2022 WL 3445349, at *2. Here, the "nature and circumstances" of Raposo's offense, 18 U.S.C. § 3553(a)(1), as well as the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," *id.* § 3553(a)(2)(A), and "to afford adequate deterrence," *id.* § 3553(a)(2)(B), strongly counsel against reducing the sentence Judge Batts imposed.

As Judge Batts explained at sentencing, Raposo's offense was exceedingly serious and dangerous, and demanded a very significant term of imprisonment. Sentencing Tr. at 18:6-17. Not only did Raposo set eight separate fires on multiple floors of 79-81 Worth Street, including the largest fire in the building's hard-to-access subcellar, but he also took specific actions to maximize the danger by pouring oil on points of egress including the fire escapes, tampering with the building's fire alarm, and locking the building's doors with a mortise lock to which he had the only key. PSR ¶¶ 11-13. As Judge Batts astutely explained, "[o]nce a fire is started and the forces of nature are invoked, no person can know what the final toll of destruction or death will be."

14

Sentencing Tr. at 18:7-9. Indeed, Judge Batts declined to downwardly depart even without finding that Raposo's motive was to kill Ruiz and Delvalle because of "the degree of risk inherent in the conduct and the nature of the underlying offense conduct." *Id.* at 8:24-25; *accord id.* at 9:1-2 ("Arson always includes the inherent risk that life will be lost."). The deadly and largely uncontrollable danger inherent to arson demands significant punishment as well as effective deterrence to would-be arsonists.

And of course here, Raposo's conduct did not only create a serious *risk* of death; it in fact did result in death. Lieutenant Lener—a firefighter of fifteen years, a husband, and a father of three young children—lost his life because of Raposo's conduct. PSR ¶¶ 20-21. While he and other FDNY firefighters were battling the fire, he lost consciousness in a foot of water. *Id.* ¶ 15. Lieutenant Lener was rushed to a hospital where he would never regain consciousness and would succumb to carbon monoxide poisoning. *Id.* ¶ 16. Judge Batts properly determined that Raposo's sentence needed to hold him accountable for Lieutenant Lener's death. Sentencing Tr. at 18:14-17.

It is worth noting as well that Judge Batts specifically took into account the possibility of Raposo's continued rehabilitation and ensured that the sentence would allow him to receive a benefit from any rehabilitation. Judge Batts deliberately structured the sentence as one consisting of a number of months that would allow for "good time [Raposo] may be able to earn and be credited with while serving his sentence." *Id.* at 19:4-6.

In sum, granting early release in this case would fail to reflect the seriousness of Raposo's crime of setting a fire that caused the death of Lieutenant Lener, would not justly punish that offense, would fail to promote respect for the law, and would not achieve adequate deterrence for such conduct. Thus, the applicable section 3553(a) factors compel the conclusion that no reduction of the imposed sentence is warranted.

## IV. Conclusion

For the above reasons, Raposo's motion for compassionate release is denied. The Clerk of Court is respectfully directed to close Docket Numbers 86, 98, and 100.

SO ORDERED

Dated: January 5, 2023
      New York, New York

                                            JOHN P. CRONAN
                                      United States District Judge